# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM WYNN, JR., | ) | 3:21-CV-00925 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEW HAVEN BOARD OF | ) | |
| EDUCATION, | ) | |
| *Defendant*. | ) | March 18, 2024 |

## RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

In this employment discrimination action, Plaintiff William Wynn, Jr. alleges that Defendant New Haven Board of Education ("BOE") violated his rights under federal and state law by not hiring him to be the BOE's Director of Transportation, failing to interview him when the position was re-posted, and later terminating him from the position he held at the BOE, due to his race, disability, and engagement in protected activity. Plaintiff brings race discrimination claims against the BOE under Title VII and the Connecticut Fair Employment Practices Act ("CFEPA") (Counts One and Three), retaliation claims under Title VII and the CFEPA (Counts Two and Four), and disability discrimination claims under the Americans with Disabilities Act ("ADA") and CFEPA (Counts Eight and Nine).[1]

Defendant seeks summary judgment on all claims, contending primarily that, based on the undisputed material facts, Plaintiff cannot demonstrate that any of Defendant's actions were taken due to Plaintiff's race, disability, or engagement in protected activity.

For the reasons set forth below, Defendant's motion is GRANTED.

---

[1] Plaintiff's claims for defamation, defamation per se, and intentional infliction of emotional distress (Counts Five, Six, and Seven) were previously dismissed by this Court.

## I.      FACTUAL BACKGROUND[2]

### A.  Director of Transportation Position

Plaintiff began working for the BOE in 2005 as the Business Manager for the athletic department.  Pl.'s L.R. 56(a)2 St. ¶ 2.  In this role, he was responsible for, among other things, overseeing the athletic department's budget and organizing transportation to games.  *Id.*  In 2015, he was promoted to be the Recruitment Coordinator for magnet schools.  *Id.* ¶ 3.  Plaintiff served as the Recruitment Coordinator until his employment ended in July of 2021.  *Id.* ¶ 4.  He did not have transportation-related responsibilities in this position.  *Id.* ¶ 5.[3]

The BOE has a separate Transportation Department responsible for creating school bus routes, coordinating pickup and drop-off locations, and overseeing all school transportation operations.  *Id.* ¶ 6.  After the head of the Transportation Department retired in June of 2018, the BOE hired a black male, Fred Till, to serve as interim Transportation Director.  *Id.* ¶ 7.

In the summer of 2019, the BOE made changes to student bus routes, which resulted in numerous complaints from parents and general confusion regarding the route changes (the "transportation crisis").  *Id.* ¶¶ 10, 12.  Between August and November of 2019, Plaintiff, along with approximately sixty to one hundred other BOE employees, was enlisted to assist with the transportation crisis.  *Id.* ¶¶ 14, 17, 18.  Plaintiff handled parent complaints, conducted investigations of safety issues reported by parents, and signed off on changes to bus stops for

---

[2] The factual background is taken primarily from Plaintiff's Local Rule 56(a)2 Statement, ECF No. 84-2 ("Pl.'s L.R. 56(a)2 St.").  The facts are undisputed, unless otherwise indicated.

[3] Plaintiff denied this fact and others in his Local Rule 56(a)2 Statement, citing to the "Wynn Affidavit" in support of the denials.  *Id.*  No such affidavit has ever been provided to the Court.  Where other evidence is cited to support a fact, the Court has considered that evidence alone.  In this instance, no other evidence before the Court demonstrates that Plaintiff's Recruitment Coordinator position entailed transportation-related duties.  *See Johnson v. Connecticut Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013), *aff'd*, 588 F. App'x 71 (2d Cir. 2015) ("Where the Plaintiff has objected to Defendant's facts but has failed to support her objection with any admissible evidence in the record, where the record itself does not support Plaintiff's denials, or where the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted.").

students. *Id.* ¶ 16.  Plaintiff claims he was brought in to "oversee the crisis situation," Def.'s Mot. for Summ. J., Ex. B, Wynn Dep. Tr., 19:9–10, and denies that Mr. Till was responsible for directing and overseeing bus routes during the crisis, but again cites to nothing but the non-existent Wynn Affidavit for this denial.  Pl.'s L.R. 56(a)2 St. ¶ 11.  Thus, the Court deems this fact admitted.

In May of 2019, prior to the transportation crisis, Plaintiff had applied for the open Director of Transportation ("DOT") position.  *Id.* ¶¶ 21, 23.  Out of sixty-four applicants, Plaintiff was the only internal candidate.  *Id.* ¶ 24.  The job description required "a Bachelor's Degree or a minimum of (15) years' experience in administering and operating school bus transportation services and routing systems," in addition to an understanding of "transportation procedures and decisions with sound fiscal management."  *Id.* ¶ 22.  The BOE formed a six-person interview committee comprised of (1) Mr. Till (a black male); (2) retired Director of Transportation Teddi Barra (a white female); (3) Director of Student Services Typhanie Jackson (a black female); (4) Chief Financial Officer Phillip Penn (a white male); (5) Assistant Superintendent Paul Whyte (a black male); and (6) Chief Operating Officer Michael Pinto (a white male).  *Id.* ¶ 25.  Dr. Iline Tracey,[4] a black female who was then superintendent, was not a member of the committee.  *Id.* ¶ 26.

Plaintiff was one of four candidates the committee selected to interview for the DOT position.  *Id.* ¶ 29.  The other three candidates selected—Britt Liotta, Paul DeMaio, and Joseph Piscitelli—were all white men and all had ten or more years of experience in the transportation industry.  *Id.* ¶¶ 30–33.  For instance, Mr. Liotta had worked in the transportation services industry for more than ten years, including as the Chief Operating Officer for the Norwalk Transit District, and Mr. DeMaio had more than twelve years of experience in the transportation industry, including as the Director of Operations and Contract Services for DATTCO, one of the two major school

---

[4] Dr. Tracey was formerly a defendant in this action, but all claims against her were previously dismissed by this Court.

bus transportation services companies in Connecticut, and the Director of Operations for the New Britain Transportation Company. *Id.* ¶¶ 31–33.  Each member of the interview committee scored the four candidates on a scale of 1-4.  *Id.* ¶ 35.  Mr. Liotta and Mr. DeMaio scored the highest of the four interviewees and were recommended by the interview committee to Dr. Tracey for further consideration on or about January 14, 2020.  *Id.* ¶¶ 35–37.  Plaintiff did not interview with Dr. Tracey.  *Id.* ¶ 38.  Mr. DeMaio later withdrew from consideration, and Dr. Tracey interviewed only Mr. Liotta.  *Id.* ¶ 39.  She submitted Mr. Liotta's name to the BOE members for selection at their January 27, 2020, meeting.  *Id.* ¶ 40.

On or about January 26, 2020, the day before the BOE meeting, Plaintiff sent a letter to Darnell Goldson, then President of the BOE, raising concerns about the hiring process for the DOT position.  *Id.* ¶ 40.  Among other things, the letter claimed that Dr. Tracey "discriminated against" Plaintiff, due to her friendship with Plaintiff's former manager in his position as a Recruitment Coordinator, with whom he had had problems and disagreements.  Def.'s Ex. J, ECF No. 81-1 at 216.  The letter claimed that Dr. Tracey blocked his placement in the DOT position, accused him of being a "slacker," and generally discredited his performance and character, despite that she had never met with Plaintiff and they had not worked together.  *Id.*  Plaintiff asserts that it was the intention of the former superintendent and the Human Resources Director to place him in the DOT position, and that Dr. Tracey would not allow that to happen.  *Id.*  The letter does not mention race. *See id.*

At the January 27, 2020, BOE meeting, Mr. Goldson, Dr. Tracey, two members of the interview committee, and other members of the BOE discussed Plaintiff's letter.  Pl.'s L.R. 56(a)2 St. ¶¶ 43–45; *see also* Def.'s Ex. K, BOE Meeting Minutes, ECF No. 81-1 at 223–24.  The BOE

ultimately voted to approve Mr. Liotta's appointment as the DOT, despite Mr. Goldson's motion to postpone the appointment.  Pl.'s L.R. 56(a)2 St. ¶¶ 43, 46.

Just two weeks after starting as DOT, Mr. Liotta resigned for personal reasons.  *Id.* ¶ 49. An article in the New Haven Register describing the process and the resignation stated that an internal candidate alleged that he was never given a "fair shake," that Mr. Goldson said that Dr. Tracey had dismissed the internal candidate's qualifications, and that "Tracey confirmed that, after the hiring process concluded, she told Goldson that she heard the internal candidate was lazy." *Id.* ¶ 50; *see also* Def.'s Ex. L, New Haven Register Article, ECF No. 81-1 at 236–37.

The BOE reposted the position in February 2020, and Plaintiff reapplied on or about March 3, 2020, with no material change in his experience or qualifications.  Pl.'s L.R. 56(a)2 St. ¶¶ 51– 52.  Again, the interview committee (comprised of the same six individuals) selected four candidates to interview for the position, but this time Plaintiff was not selected for an interview. *Id.* ¶¶ 53–54; Def.'s Ex. A, Flegler Aff. ¶ 46.  The interviews took place in June of 2020.  Pl.'s L.R. 56(a)2 St. ¶ 53.  Ultimately, the interview committee recommended to Dr. Tracey, and the BOE approved, the appointment of Carl Jackson, a black man, who had more than ten years of experience in the transportation field, including as the Director of Public Transportation in Greenville, South Carolina, and the Public Transit Administrator for the Connecticut Department of Transportation.  *Id.* ¶ 55.

On March 18, 2020, and August 17, 2020, Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Connecticut Commission on Human Rights and Opportunities ("CHRO"), claiming race discrimination and retaliation related to the DOT position selection process.  *Id.* ¶¶ 57, 58.

B. <u>Leave Requests and Termination</u>

In February of 2021, after being out of work for two weeks due to a cardiac event, Plaintiff applied for and was granted leave under the Family and Medical Leave Act ("FMLA"). *Id.* ¶ 60; *see also* Def.'s Ex. M, ECF No. 81-1 at 240 (listing "stress" and "cardiology followup" as relevant medical facts). His initial expected return date was April 20, 2021. Pl.'s L.R. 56(a)2 St. ¶ 61. On April 6, 2021, Plaintiff applied for and was granted short-term disability leave, extending his expected return date to July 2, 2021. *Id.* ¶¶ 62, 63. On April 19, 2021, Plaintiff submitted a return-to-work form indicating he was cleared to return to work on July 1, 2021. *Id.* ¶ 64.

On June 25, 2021, Plaintiff requested via email a further extension of his medical leave, providing a note from his physician stating that he would be "out of work until further notice." *Id.* ¶ 65. The note did not provide information on Plaintiff's condition or prognosis. *Id.* On July 7, 2021, representatives from Human Resources ("HR") sent Plaintiff, via email and mail, a letter notifying him that his request for further leave had been denied, that he had exhausted all leave entitlements, that he was expected to return to work on July 12, 2021, and any further leave would be considered unapproved.[5] *Id.* ¶ 68. On July 15, 2021, Plaintiff's supervisor emailed HR, copying Plaintiff's personal email address, stating that he had been notified that Plaintiff was to report for work on July 12, but he did not and did not notify his supervisor "of his whereabouts." Def.'s Ex. S, ECF No. 81-1 at 260–61. On July 16, 2021, Plaintiff used his personal email address to notify various HR representatives that he was out sick "in accordance with the doctor's note submitted on July 25th." Def.'s Ex. T, ECF No. 81-1 at 264. One HR representative responded, notifying

---

[5] Plaintiff denies receiving this letter until after his termination, though this denial again relies on the missing affidavit. *Id.* ¶ 68. It is also not clear whether the emails were sent to Plaintiff's work or personal email address, though it appears from the format of the email address that it may have been his work email address, which he testified he had no access to. *Compare* Def.'s Ex. T, ECF No. 81-1 at 263–64 (July 16, 2021, emails sent to and from "William Wynn <[personal email address]>") *to* Def.'s Ex. O, ECF No. 81-1 at 249–50 (July 7, 2021, emails sent to "WYNN, WILLIAM").

him that "the note provided was not approved," and he had been marked sick the last two days, and another responded on the same chain advising Plaintiff that he was "currently on an unauthorized leave" and "being coded as unauthorized leave of absence." *Id.* at 264, 263.[6]

On July 21, 2021, HR mailed Plaintiff another letter stating that if he did not return to work before July 23, 2021, his continued absence would be considered a voluntary quit. Def.'s Ex. V, ECF No. 81-1 at 273; *id.* at Ex. W, Collective Bargaining Agreement, ECF No. 81-1 at 280 (describing policy providing that absence of five consecutive work days without notification to supervisor shall be deemed a voluntary quit). Between July 19 and July 23, Plaintiff nonetheless continued to send emails notifying HR that he was out sick and, on the morning of July 23, 2021, he sent a doctor's note stating he was "advised to stay out of work" until September 23, 2021, due to "his medical conditions, and follow up appointments with multiple specialists." *Id.* at Ex. U, ECF No. 81-1 at 266–71. On July 26, 2021, HR Director Lisa Mack sent Plaintiff a letter stating that he had provided an insufficient medical certificate, and had "exhausted [his] accrued leave time, [his] approved FMLA, and short-term disability" leave and therefore was considered terminated as of July 26, 2021. Def.'s Ex. X, ECF No. 81-1 at 284. Other employees have likewise been terminated by the BOE for failure to return from medical leave. Pl.'s L.R. 56(a)2 St. ¶ 85.

Throughout his period of leave from the BOE, Plaintiff worked a second job as a security guard at the Waterbury Hospital, a job he had worked since 2016. *Id.* ¶¶ 87–88.

---

[6] Plaintiff avers that he "did not receive this email even though it may have been sent," once again relying on the missing affidavit. *See* Pl.'s L.R. 56(a)2 St. ¶ 71. Even accepting Plaintiff's contention that he was only receiving email through his personal address at the time, *see* Wynn Dep. Tr. at 136:10–11, these emails were plainly sent to that address, and Plaintiff testified that he was checking his email throughout this time and only communicating via email, *see id.* at 130:6–10, 136:3. Thus, his claims that he did not receive the emails sent to his personal email address are implausible.

## II.     LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S.

8

at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### B. *McDonnell Douglas* Burden-Shifting

All of Plaintiff's claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), with some variations with respect to particular claims, as explained below.  See *id.* at 802–05 (Title VII race discrimination claim); *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (Title VII retaliation claim); *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (ADA disability discrimination claim); *Eaddy v. City of Bridgeport*, 156 Conn. App. 597, 603–04 (2015) (CFEPA discrimination claims); *Phadnis v. Great Expression Dental Centers of Connecticut, P.C.*, 170 Conn. App. 79, 95 (2017) (CFEPA retaliation claim).  Although the *McDonnell Douglas* framework effectively shifts the "intermediate evidentiary burdens" between the plaintiff and defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff," or that the defendant intentionally retaliated against the plaintiff, "remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up; quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Burdine*, 450 U.S. at 252–53. The particular elements of the plaintiff's *prima facie* case vary depending on the substantive claim, but the plaintiff's burden at this step is *de minimis*. *Id.* at 253 (noting that the plaintiff's burden of satisfying a *prima facie* case is "not onerous"). If the plaintiff satisfies his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment action. *Id.* at 254.

If the defendant articulates a legitimate, non-discriminatory or non-retaliatory reason for its action, the burden shifts back to the plaintiff to show that the proffered reason is "not the true reason" or is otherwise a pretext for discrimination. *Id.* at 256; *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

The final step of the *McDonnell Douglas* framework requires the court to examine the entire record—including evidence from the plaintiff's *prima facie* case, additional evidence suggesting pretext, and other evidence of the defendant's discriminatory or retaliatory intent—and to "determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated" or retaliated against him. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also Burdine*, 450 U.S. at 256 (explaining that the plaintiff's third-step burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination"). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including the "strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false," and any other properly considered evidence that supports the employer's case. *Reeves*, 530 U.S. at 148–49.

### III.    DISCUSSION

For the reasons discussed below, Defendant's motion for summary judgment is GRANTED in full.

#### A.   Title VII and CFEPA Racial Discrimination Claims (Counts One and Three)

First, the Court finds that summary judgment is appropriate in favor of Defendant on Plaintiff's racial discrimination claims.

Title VII makes it unlawful to "discharge any individual, or otherwise . . . discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).  As the CFEPA follows the same burden-shifting framework as the Court utilizes for the federal claim, the Court analyzes the federal and state claims together.  *See Boutin v. Comcast Cable Commc'ns Mgmt., LLC*, No. 3:21-CV-1630 (SVN), 2023 WL 4564375, at *5 (D. Conn. July 17, 2023).

Initially, the Court notes that Plaintiff appears to be challenging only the first round of hiring as racially discriminatory, based on his brief—which references only the initial hiring of Mr. Liotta for the position, and not Mr. Jackson, who was hired after the second round, *see* Pl.'s Opp. Br., ECF No. 84 at 6—and his counsel's representations at oral argument that the second round of hiring is more relevant to Plaintiff's retaliation claim, *see* Oral Arg. Tr., ECF No. 100 at 33:9–12.  The Court therefore focuses on Plaintiff's rejection from the position in early 2020.

##### 1.   *Prima Facie Case*

In order to demonstrate a racial discrimination claim for failure to promote under the *McDonnell Douglas* burden-shifting framework, Plaintiff must first make a *prima facie* showing that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3) [he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's

qualifications." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (citation omitted); *see also McDonnell Douglas Corp.*, 411 U.S. at 802.  In addition, there must be proof that the rejection occurred "under circumstances which give rise to an inference of unlawful discrimination." *Aucilino*, 580 F.3d at 80 (citation omitted); *see also Ruszkowski v. Kaleida Health Sys.*, 422 F. App'x 58, 60 (2d Cir. 2011) (summary order).

The parties agree Plaintiff was a member of a protected class and that someone else was hired, and dispute only whether (1) Plaintiff was qualified for the DOT position; and (2) the failure to promote Plaintiff occurred under circumstances giving rise to an inference of discrimination.

a.  Qualification

Plaintiff has carried his *prima facie* burden of demonstrating he was qualified for the Director of Transportation position.  The job description required "a Bachelor's Degree *or* a minimum of (15) years' experience in administering and operating school bus transportation services and routing systems," and an understanding of "transportation procedures and decisions with sound fiscal management," among other things. Def.'s Ex. C, ECF No. 81-1 at 171 (emphasis added).  It is undisputed that Plaintiff had a Bachelor's Degree, that his position in the athletic department (a position he held for ten years) involved school bus transportation, and that he assisted with the transportation crisis.  His résumé also states that he had budgeting experience in his role in the athletics department.  *See* Def.'s Ex. G, ECF No. 81-1 at 186.  This is enough for a *prima facie* showing of qualification, as Plaintiff arguably meets the express criteria of the job posting.  *See Cooper v. Connecticut Pub. Def.'s Off.*, 480 F. Supp. 2d 536, 544 (D. Conn. 2007), *aff'd sub nom. Cooper v. State of Connecticut Pub. Defs. Off.*, 280 F. App'x 24 (2d Cir. 2008) (finding plaintiff established *prima facie* case where she demonstrated that she "possessed the minimum qualifications for the position"); *cf. Jackson v. Univ. of New Haven*, 228 F. Supp. 2d

156, 161–62 (D. Conn. 2002) (employee failed to make out *prima facie* case because he did not have coaching experience which was an "express condition of the employment"); *Ruszkowski*, 422 F. App'x at 60 (plaintiff who had no prior supervisory experience was not qualified for the position of phlebotomy supervisor).

Defendant argues that Plaintiff had no experience "in the transportation industry," and that he was *less* qualified than the candidate selected, *see* ECF No. 80 at 10–14.  The job posting, however, did not require experience in the "transportation industry"—only general transportation experience—and, at the *prima facie* stage, courts generally evaluate an employee's qualification with respect to the "criteria the employer has specified for the position," and save for a later stage the comparison between employee qualifications.  *See Jackson*, 228 F. Supp. 2d at 161 (citing *Thornley v. Penton Publ'g*, 104 F.3d 26, 29 (2d Cir. 1997)); *see also Chenette v. Kenneth Cole Prods., Inc.*, No. 05 CIV. 4849 (DLC), 2008 WL 3176088, at *5 (S.D.N.Y. Aug. 6, 2008), *reconsidered on other grounds*, 2008 WL 4344588 (S.D.N.Y. Sept. 16, 2008), *and aff'd*, 345 F. App'x 615 (2d Cir. 2009) (considering plaintiff's qualifications *vis-à-vis* other candidates at second stage of analysis).

The Court therefore finds Plaintiff has met his *prima facie* burden of demonstrating his baseline qualification for the DOT position.

### b.  Inference of Discrimination

The Court also concludes that Plaintiff has carried his *prima facie* burden of demonstrating that the failure to promote him occurred under circumstances which could give rise to an inference of discrimination.  To meet this burden, Plaintiff has pointed to the undisputed fact that a white man, Mr. Liotta, was ultimately selected for the position after the first round of hiring.  That a person outside the protected class was hired is often enough on its own to carry the (light) *prima*

*facie* burden for a racial discrimination claim.  *See Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis . . . ."); *Craine v. Trinity Coll.*, 259 Conn. 625, 639 (2002) (noting that "[t]he most typical method used by plaintiffs to establish the fourth prong of a prima facie case is to introduce evidence that the defendant later considered, hired, granted tenure to, or promoted comparably qualified individuals not in a protected class of individuals").[7]  Accordingly, the Court proceeds to the two remaining steps of the *McDonnell Douglas* burden-shifting framework.

## 2.  *Legitimate, Non-Discriminatory Reason*

At the second step, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its decision to not hire Plaintiff for the DOT role.  At this stage, Defendant must "introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action."  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original).  The Court finds it has done so.

Defendant asserts that Plaintiff was not chosen for the DOT position because Plaintiff was less qualified than the other candidates that the interview committee passed on to Dr. Tracey, due to his relative lack of experience in the transportation industry and with transportation.  Defendant has introduced ample evidence supporting its position.  *See, e.g.*, Flegler Aff. ¶ 48; Def.'s Ex. D, Liotta Résumé, ECF No. 81-1 at 174–177; *id.* at Ex. F, DeMaio Job App., ECF No. 81-1 at 182–83; *id.* at Ex. G, Wynn Résumé, ECF No. 81-1 at 185–187; *id.* at Exs. H and I, Interview Score

---

[7] Plaintiff also relies on the allegedly discriminatory comments made by Dr. Tracey regarding Plaintiff's laziness and Dr. Tracey's alleged overall influence on the hiring process.  Defendant argues that Dr. Tracey's comments, which are in the record solely through Plaintiff's letter and the New Haven Register article, are inadmissible hearsay, *see* ECF No. 80 at 14, and therefore cannot be relied upon.  Plaintiff does not address this argument.  As the Court finds that the hiring of Mr. Liotta alone is enough to meet this element of Plaintiff's *prima facie* case, it need not decide Defendant's hearsay argument.

Sheets, ECF No. 81-1 at 189–213. Collectively, this evidence permits the conclusion that Defendant viewed Plaintiff as less qualified for the DOT position than Mr. DeMaio or Mr. Liotta, given his relative lack of experience in the transportation industry. For instance, multiple interviewer score sheets reference this relative lack of experience. *See, e.g.*, Ex. I, ECF No. 81-1 at 208 (noting a weakness was "limited bus experience"), 213 (noting a weakness as "[n]o demonstrated experience w/ routing"). This is a legitimate, non-discriminatory reason for choosing to hire other candidates over Plaintiff. *See Peddy v. L'Oreal USA, Inc.*, 848 F. App'x 25, 26 (2d Cir. 2021) (summary order) (other candidates' interview performance, relevant skill set, and level of seniority were legitimate non-discriminatory reasons for rejecting the plaintiff); *Szewczyk v. Saakian*, 774 F. App'x 37, 39 (2d Cir. 2019) (summary order) (other candidate's more relevant experience was a legitimate nondiscriminatory reason for rejecting the plaintiff). Thus, the burden shifts back to Plaintiff to show that Defendant's reason is not the true reason or that it is otherwise pretextual.

### 3. *Pretext*

Finally, Plaintiff has not produced evidence to show Defendant's proffered rationale for its hiring decision is a pretext for racial discrimination, or which would otherwise allow a reasonable jury to conclude Defendant's actions were motivated by improper discrimination.

First, Plaintiff does not even appear to directly challenge the substance of Defendant's contention that he was less qualified than the other applicants, arguing only that he was qualified for the position as a general matter. *See* ECF No. 84 at 6–10. Nonetheless, for the sake of completeness, the Court notes that, in order for Plaintiff's qualifications to constitute circumstantial evidence of discrimination, Plaintiff would have had to demonstrate that his credentials were "so superior to the credentials of the person selected for the job that no reasonable

person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Peddy*, 848 F. App'x at 26–27 (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (internal quotation marks omitted), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e)).   Although the Court has determined that Plaintiff was qualified for the position, he has not demonstrated that his qualifications so dwarfed those of two finalists that no reasonable person would have hired them over Plaintiff.   Even accepting that Plaintiff had more than ten years of transportation experience, this would at best put him on equal footing with the other candidates.   *See* Pl.'s L.R. 56(a)2 St. ¶¶ 31–33.   Defendant was perfectly entitled to weigh other factors, such as whether that experience was in a high-level position or in the transportation industry, in addition to interview performance, to make its decision.   *See Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 16 (2d Cir. 2009) (summary order) (noting that plaintiff "could not avoid summary judgment simply by pointing to evidence that might prompt a factfinder to conclude that she was otherwise qualified for the promotion," because "an employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria") (citation omitted).   And the evidence submitted demonstrates that Defendant *did* in fact weigh such criteria, leading to lower overall interview scores for Plaintiff, *see* Def.'s Ex. I, ECF No. 81-1 at 208–13.

Moreover, although the Court agrees Plaintiff has demonstrated in this litigation that he had ten years of transportation experience (defined broadly) from his position in the athletic department and his assistance with the transportation crisis, it is not clear that all members of the interview committee would have even been aware of this experience, as Plaintiff did not include any information about transportation in his résumé, *see* ECF No. 81-1 at 186, or job application, *see* Def.'s Reply Br. Ex. 2, ECF No. 89-2 at 2–15, and he could not remember whether he even

16

discussed it in the interview, *see* Wynn Dep. Tr. at 54:1–8.  In fact, he seemed to recognize in his deposition that the main asset he brought to the DOT position was not his transportation experience, but his general leadership and management skills.  *Id.* at 65–66.  Regardless, even if the interview committee was made fully aware of his alleged transportation *bona fides*, it legitimately weighed Plaintiff's qualifications against those of the other candidates and found Plaintiff's wanting.  That Plaintiff disagrees with the result reached by the interview committee and Defendant is insufficient to show that Defendant's legitimate reason for not promoting Plaintiff was pretextual for racial discrimination.  *See Chenette, Inc.*, 345 F. App'x at 619 (upholding summary judgment in employer's favor on failure to promote claim in part because "plaintiff's merely subjective assessment of her own qualifications for promotion cannot defeat evidence that other individuals were more qualified") (internal quotation marks and citation omitted); *Cooper*, 480 F. Supp. 2d at 546 ("That Cooper disagrees with [the] characterization of her performance is not enough to show unlawful animus.").

Plaintiff 's primary argument with respect to his qualifications is that the "current attempt to downplay" Plaintiff's transportation experience "must be seen as circumstantial evidence that Defendant is dissembling to cover up its unlawful and intentional discrimination."  *See* ECF No. 84 at 6–10.  The Court disagrees.  Plaintiff seems to argue that the inconsistency between Defendant's position (that Plaintiff was qualified enough for an interview) and its litigation position (that Plaintiff was not qualified for the position) demonstrates the falsity and pretext of its decision not to promote Plaintiff.  However, Plaintiff provides no support for his claim that a defendant's subsequent position *in litigation* can be considered evidence to establish a past unlawful discriminatory motive.  Plaintiff repeatedly cites the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000); while *Reeves* held that "a plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's asserted justification is false" could permit the trier of fact to conclude that unlawful discrimination occurred, it did not hold that "sufficient evidence" of falsity could include arguments made by counsel in a legal brief. *See Reeves*, 530 U.S. at 148.  And to the extent there is inconsistency in the positions Defendant took at the time—that Plaintiff was qualified enough to be interviewed but ultimately not as qualified as other candidates—it is common sense that Plaintiff would be compared to other applicants at the interview stage and that only one person would be selected.[8]  Any supposed inconsistency does not undermine the veracity of Defendant's position that Plaintiff was ultimately passed over because he was *less* qualified than the other interviewees.

Next, with respect to the comments allegedly made by Dr. Tracey (that he was a "slacker" and "lazy"), Plaintiff offers no evidence to support his contention that these comments demonstrate bias *based on race*, such that a reasonable jury could infer a discriminatory motive on behalf of Defendant.  Even assuming the statements are admissible, Plaintiff has provided no evidence of when or in what context these statements were made, such that it could be inferred they were racially discriminatory or even the kind of "ethnically degrading term[s]" or "invidious comments" that could typically create an inference of discrimination.  *See Szewczyk*, 774 F. App'x at 39–40 ("[Defendant's] statement that [plaintiff] was from Poland is not sufficient to create an inference of discrimination, as [defendant] did not use any ethnically degrading term or make any invidious comments about Polish people.").  In fact, Plaintiff testified at his deposition that he had "no context" for the statement that he was "lazy."  Wynn Dep. Tr. at 74–76.  And, in his January letter regarding the hiring process, he stated that Dr. Tracey's animus towards him stemmed from her

---

[8] The Court notes that Defendant also submitted evidence that the decision to interview Plaintiff was "in part because he was the only internal candidate," an explanation which would explain any inconsistencies in Defendant's position. Flegler Aff. ¶ 32.

friendship with his former manager, not anything to do with his race.  Ex. J, ECF No. 81-1 at 216.

While it may be possible for "vague words" like "lazy" or "slacker" to "serve as a mask for

discrimination" in certain contexts, Plaintiff has provided no evidence to demonstrate that, here,

they were intended in that manner.  *See Chen*, 805 F.3d at 74–75 (recognizing that "collegiality"

could be discriminatory, but finding it was not under the circumstances presented and noting that,

"even if sincerely held, a plaintiff's feelings and perceptions of being discriminated against do not

provide a basis on which a reasonable jury can ground a verdict") (internal quotation marks and

citation omitted); *Lloyd v. Holder*, No. 11 CIV. 3154 (AT), 2013 WL 6667531, at *8, *10

(S.D.N.Y. Dec. 17, 2013) (granting summary judgment where plaintiff could not demonstrate that

facially neutral words, such as lazy, were discriminatory because she "fail[ed] to adduce any other

evidence of discrimination supporting her claim").  Thus, as it stands, Plaintiff's contention that

the failure to promote him was based on Dr. Tracey's racial animus towards him is based on pure

speculation, namely his testimony that he "believe[d] [his] race was a factor [in the decision not to

promote him] because of the influence that Dr. Tracey had on those individuals that were in the

interview process," and that he "believe[d]" his race was "a component" of why Dr. Tracey did

not like him.  Wynn Dep. Tr. 70:5–7, 78:15–18.  This kind of pure speculation "cannot be used to

overcome summary judgment."  *Szewczyk*, 774 F. App'x at 39–40.

This conclusion is bolstered by several other factors.  First, it bears repeating that Dr.

Tracey was not a member of the interview committee.  Though she made the ultimate decision of

who to hire, and was likely a generally influential figure as the superintendent, there is no dispute

that the interview committee passed on to her for consideration only their top two candidates.

Thus, she was not even presented with Plaintiff's application.  In that sense, the interview

committee—not Dr. Tracey—sealed Plaintiff's fate, and any animus Dr. Tracey may have held

towards Plaintiff becomes far less relevant to the adverse employment decision. *See Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 339 (D. Conn. 2013) (racist comments by someone "other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark") (quoting *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir.2007)); *Lee v. Grocery Haulers*, Inc., No. 22-680, 2023 WL 8253089, at *1 (2d Cir. Nov. 29, 2023) (summary order) (finding that "no reasonable juror could draw an inference of discrimination on the part of [employees] who actually did the firing," where racist remarks were made by another employee who was not the decisionmaker).

Nothing submitted to the Court suggests that Dr. Tracey's alleged bias against Plaintiff (even were the Court to assume it was racial bias), so "infected and tainted the decision-making process," *see* ECF No. 84 at 19, that an inference of discrimination can be drawn. *See Rivera*, 933 F. Supp. 2d at 339–40 (noting that plaintiff's "surmise" that "in this small, family-owned company, every one of the family member managers had a say in an employee's termination, is just that—a surmise without any evidentiary support"). For instance, the New Haven Register article and Plaintiff's letter surfaced *after* Plaintiff's application had long been rejected; thus, Plaintiff in no way demonstrates that Dr. Tracey's comments, even assuming they were made and heard by the interview committee, did or even could have impacted the decision to pass him over in the first round. *See id.* (noting that racist remark had "no causal relationship" to the decision to terminate plaintiff, and accordingly rejecting plaintiff's claim of discrimination). Plaintiff also has not provided any evidence, aside from his own speculation, that Dr. Tracey exercised significant influence over the committee's decision. As there is no evidence that the comments or any other action taken by Dr. Tracey was racially charged or motivated and no evidence that she exerted

outside control over the committee members' decision not to advance Plaintiff's application, no reasonable juror could conclude that any racial bias undergirded the decision not to promote Plaintiff.[9]

The Court addresses two final points.  In his January letter, and in opposition to summary judgment, Plaintiff claims that the failure of an HR representative to attend his interview was "not normal practice."  *See* Ex. J, ECF No. 81-1 at 217; ECF No. 84 at 18 (arguing that the "fact that Defendant department from its normal process" raises a question "regarding the good faith of the process"); *see also* Wynn Dep. Tr. at 89:9–16 ("[I]t doesn't make sense that someone from human resources wasn't there.").  While it is undisputed that no member of HR was present during the interview, Plaintiff's only evidence that this was irregular are his own unsubstantiated allegations.  He has submitted no policy or other indication that this was the norm, nor any evidence that the other interviews occurred with HR present.  On the other hand, Defendant submitted an affidavit from the Director of HR stating that it was not uncommon for interviews of high-level positions to proceed without an HR representative present.  Flegler Aff. ¶ 31.  Even if this is a dispute of fact, it is not a material one, as there is no evidence in the record that this supposed procedural irregularity "reasonably affect[ed] the decision," as required to support an inference of pretext or discrimination.[10]  *See Cooper*, 480 F. Supp. 2d at 546 (citation omitted).  Lastly, Plaintiff argues that the decision not to interview Plaintiff a second time when the position reopened demonstrates that Defendant's reason for not hiring Plaintiff after the first round (his inferior qualifications) is

---

[9] The Court also notes Dr. Tracey and several members of the interview committee are members of the same protected class as Plaintiff, which supports an "inference against discrimination," *see Younger v. Hanks*, No. 12-CV-1814 (AWT), 2015 WL 540643, at *6 (D. Conn. Feb. 10, 2015) (citation omitted), albeit not a conclusive one, *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–79 (1998).

[10] The Court notes that, somewhat confusingly, Plaintiff raised this argument in the section of his brief devoted to his retaliation claims.  *See* ECF No. 84 at 12–18.  Regardless of whether Plaintiff intended to raise this point as evidence of racial discrimination, retaliation, or both, it fails to create a genuine dispute of material fact as to whether Defendant's actions were at all improperly motivated.

pretextual, because Defendant had already decided Plaintiff was sufficiently qualified to interview for the position. The Court disagrees. It is undisputed that there was no material change in Plaintiff's application between the first and second hiring rounds. Thus, Defendant, having decided that Plaintiff was not *sufficiently* qualified for the position in the first round, was entitled to solicit new applicants and not give Plaintiff a second chance at the position.

In sum, because no reasonable jury could conclude that Defendant discriminated against Plaintiff on the basis of his race, Defendant is entitled to summary judgment on Counts One and Three.

### B. Title VII and CFEPA Retaliation Claims (Counts Two and Four)

The Court also grants Defendant's summary judgment motion as to Plaintiff's retaliation claims.

Title VII prohibits an employer from retaliating against an employee because the employee has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a); *Chen*, 805 F.3d at 70. "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). An employee engages in protected activity when he has "(1) 'opposed any practice made an unlawful employment practice' by Title VII, or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Barlow v. Connecticut*, 319 F. Supp. 2d 250, 261 (D. Conn. 2004), *aff'd sub nom. Barlow v. Dep't of Pub. Health, Connecticut*, 148 F. App'x 31 (2d Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)).

Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of retaliation in violation of Title VII by showing: "(1) participation in a protected activity; (2) that

the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal

connection between the protected activity and the adverse employment action." *Hicks v. Baines*,

593 F.3d 159, 164 (2d Cir. 2010); *accord Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir.

2012).  A plaintiff can establish a *prima facie* case through circumstantial evidence, including that

the challenged action was taken in close temporal proximity to the protected conduct.  *See Chawki*

*v. NYC Bd. of Educ.*, 341 F. App'x 660, 661 (2d Cir. 2009) (summary order).  If the plaintiff

establishes a *prima facie* case, and if the defendant then proffers a legitimate, non-retaliatory

reason for the adverse employment action, the burden shifts back to the plaintiff to show that the

proffered reason is pretextual.  *Kwan*, 737 F.3d at 845.  The plaintiff's ultimate burden on a Title

VII claim is to show that retaliation was "a 'but-for' cause of the adverse action, and not simply a

'substantial' or 'motivating' factor in the employer's decision." *Id.* (citing *Univ. of Tex. Sw. Med.*

*Ctr. v. Nassar*, 570 U.S. 338, 349, 360 (2013)).  But-for causation "does not require proof that

retaliation was the only cause of the employer's action, but only that the adverse action would not

have occurred in the absence of the retaliatory motive." *Id.* at 846.[11]

Plaintiff engaged in three allegedly protected activities:  (1) sending the January 26, 2020,

letter discussing his concerns with the hiring process; (2) filing an EEOC complaint in March of

2020; and (3) filing a CHRO complaint in August of 2020.  Defendant's awareness of these

activities is not challenged and, indeed, knowledge is generally imputed to the organization.  *See*

*Kwan*, 737 F.3d at 844.  There is also no dispute that Plaintiff suffered two adverse employment

actions:  (1) failure to be interviewed for the second round of hiring for the DOT position; and (2)

---

[11] Defendant cites *Wallace v. Caring Sols., LLC*, 213 Conn. App. 605 (2022), for the proposition that CFEPA uses a
motivating factor causation standard, rather than a but-for causation test.  However, it is not clear that *Wallace* applies
to retaliation claims, as opposed to CFEPA discrimination claims.  *See Dawson v. Sec. Servs. of Connecticut Inc.*, No.
3:20-CV-01310 (SVN), 2022 WL 17477601, at *9 n.6 (D. Conn. Dec. 6, 2022).  For purposes of this ruling, the Court
need not resolve which causation test applies as, even under the more lenient standard, Plaintiff's claim fails.

termination. [12]  The primary dispute is whether there is any causal connection between the adverse employment actions and Plaintiff's protected activity.

### 1.  Protected Activity

There is no dispute that Plaintiff's EEOC and CHRO complaints constitute protected activity.  Defendant argues, however, that Plaintiff's letter, which does not discuss race explicitly, was not a protected activity.  It is true that the letter does not mention race, although it does use words like "discriminate" and "bias."  *See* Ex. J, ECF No. 81-1 at 216.  The Court agrees it is not clear that the letter constituted protected activity, insofar as it is not clear it opposes a practice made unlawful by Title VII, such as racial discrimination.  *See, e.g.*, *Jarrell v. Hosp. for Special Care*, 626 F. App'x 308, 311 (2d Cir. 2015) (summary order) (complaint that "did not allege any discrimination premised on race" was not protected activity); *Rivera*, 933 F. Supp. 2d at 342 (memo that "made no mention of discriminatory treatment on the basis of race" was not protected activity).  However, the Court need not definitively resolve this issue for purposes of this motion.  For purposes of this ruling, the Court assumes the letter, in addition to the complaints, was protected activity.

### 2.  Failure to Interview and Promote

The question then becomes whether the failure to interview Plaintiff, and therefore the failure to promote him in the second round, *see* ECF No. 84 at 15, was casually connected to his January 26, 2020, letter or his March 18, 2020, EEOC complaint.  The parties agreed at oral argument that there is no evidence in the record demonstrating when the decision was made not to

---

[12] Plaintiff does not claim that the failure to hire him after the first round was retaliatory, as that decision was made before he engaged in any allegedly protected activity.  In addition, the Court notes that it is not entirely clear Plaintiff brings a Title VII/CFEPA retaliation claim related to his termination, separate and apart from his disability discrimination claim.  *See* ECF No. 84 at 26 (citing Plaintiff's termination as "circumstantial evidence" of "retaliatory action" in section entitled "disability discrimination/retaliation").  In an abundance of caution, the Court analyzes Plaintiff's termination under both claims.

interview Plaintiff a second time, but it must have occurred some time between Plaintiff submitting his application (March 3, 2020) and the second-round interviews being conducted (June 26, 2020). At most, then, there was slightly more than five months between the January letter and the decision, and only approximately three months between the EEOC complaint and the decision. This temporal proximity is sufficient to meet Plaintiff's *prima facie* burden of demonstrating a causal connection between the protected activity and adverse action. *See Chawki*, 341 F. App'x at 661; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("five months is not too long to find the causal relationship").

The burden then shifts back to Defendant. Like the decision not to hire Plaintiff in the first round, Defendant's proffered reason for not interviewing Plaintiff in the second round is that the BOE had already determined he was not sufficiently qualified for the position, having thoroughly vetted him in the first interview process. Flegler Aff. ¶ 48. As discussed above, this is a legitimate, non-retaliatory reason for declining to interview Plaintiff a second time. Thus, the burden shifts back to Plaintiff.

At the third stage, Plaintiff's retaliation claims for the failure to interview fail, as Plaintiff cannot demonstrate that this rationale was pretextual and that, in fact, retaliation was a motivating factor in the decision not to interview him. At this step, Plaintiff cannot rely merely on the coincidence of timing. *See Fu v. Consol. Edison Co. of New York, Inc.*, 855 F. App'x 787, 791 (2d Cir. 2021) (summary order) (noting that "unlike at the prima facie stage, [plaintiff] cannot rely on the inferences of timing alone" at step three). Faced with this, Plaintiff again falls back on his contention that Defendant's changed position (that his application merited an interview in the first round but did not merit an interview in the second round) demonstrates pretext. *See* ECF No. 84 at 22. As discussed above, however, Plaintiff's personal disagreement with the decision is not

enough to demonstrate that the decision was pretext, nor is his speculation, as the question is not whether Defendant's stated purpose was "unwise or unreasonable," but whether the "articulated purpose is the actual purpose" for the challenged action. *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993). Although Plaintiff argues that Defendant's position is internally inconsistent, the Court disagrees, and Plaintiff does not point out any actual inconsistencies in its position (*i.e.*, a changing story for why Plaintiff was not interviewed), that could rise to the level of an inference of retaliatory intent. *See Kwan*, 737 F.3d at 847 (precluding summary judgment where plaintiff showed that defendant gave multiple "inconsistent explanations for her termination"). Thus, Plaintiff's retaliation claim based on the failure to interview and promote fails as, beyond timing, there is no genuine dispute that Defendant's actions were motivated, in whole or in part, by retaliation.

### 3.   *Termination*

As for Plaintiff's termination, which occurred on July 23, 2021, Plaintiff cannot even meet his *prima facie* burden, as his termination occurred more than one year after his January 2020 letter and March 2020 complaint, and almost one year after his August 2020 CHRO complaint. While the Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between a protected activity and an alleged retaliatory action, courts in this circuit have typically measured that gap as a matter of months, not years." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (internal quotation marks and citation omitted). The significant time between Plaintiff's protected activity and his termination, combined with the fact that an "intervening event"—his extended medical leave—occurred "dispels an inference of a causal relationship between the protected activity and Plaintiff's termination." *See Rivera*, 933 F. Supp. 2d at 342 (finding that

intervening event broke causal chain in protected activity and termination which occurred one month apart).

Even assuming Plaintiff had met his *prima facie* burden, however, any retaliation claim related to his termination would fail.  Defendant proffered a non-retaliatory reason for terminating Plaintiff:  his request for indefinite medical leave.  Defendant has put forth evidence of this decision in the numerous emails and correspondence submitted to the Court regarding Plaintiff's leave of absence.  In an attempt to demonstrate that this rationale is pretext, Plaintiff again falls back on mere speculation and, once again, this method fails.  For instance, Plaintiff argues that Defendant always knew that Plaintiff was working a second job, so claiming it found out Plaintiff was continuing to work that job during his leave would be false and a pretext for the decision to terminate.  *See* ECF No. 84 at 26–28.  This argument misses the point.  First, Defendant does not claim it terminated Plaintiff due to his continuing to hold a second job, as opposed to requesting an extended medical leave.  Second, Defendant's contention was that it suspected Plaintiff was *still working* at his second job during his medical leave, which cast doubt as to whether his health situation actually prevented him from working—not that it learned Plaintiff had a second job at all.  *See* Pl.'s L.R. 56(a)2 St. ¶ 90.  Plaintiff's argument therefore does not undermine Defendant's proffered non-retaliatory reason for terminating him.  Plaintiff argues (without citation to evidence) that he was treated differently than other employees with respect to his termination because none of them had, like Plaintiff "engaged in the protected activity of making an in-house complaint of retaliation, nor an external CHRO complaint."  *See* ECF No. 84 at 28.  His unsupported assertions are insufficient.  Ultimately, no reasonable juror, based on the evidence submitted, could determine that he was terminated in retaliation for complaints submitted many months prior, as there is no evidence beyond Plaintiff's speculation suggesting a causal connection

between the complaints and his termination.  *See Szewczyk*, 774 F. App'x at 39–40 ("[S]peculation cannot be used to overcome summary judgment.").

Accordingly, Defendant's motion for summary judgment is GRANTED as to Counts Two and Four.

### C.  ADA and CFEPA Disability Discrimination Claims (Counts Eight and Nine)

Finally, the Court grants Defendant's motion for summary judgment on Plaintiff's disability discrimination claims.

Both the ADA and the CFEPA prohibit employers from engaging in certain adverse employment actions, including discharge, due to an employee's disability.  42 U.S.C. § 12112(a); Conn. Gen. Stat. § 46a-60(b)(1).   Under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of disability discrimination (under either the ADA or the CFEPA) by showing that:  (1) the employer is subject to the relevant statute; (2) the plaintiff is disabled within the meaning of the relevant statute; (3) the plaintiff was "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation;" (4) the plaintiff suffered an adverse employment action; and (5) the adverse action "was imposed because of [his] disability."  *See Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)) (ADA elements); *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 426 (2008) (CFEPA elements).   Specifically, a plaintiff must satisfy the final element of his *prima facie* case by showing that the adverse employment action "took place under circumstances giving rise to an inference of discrimination."  *Davis*, 804 F.3d at 235 (citation omitted).

If the plaintiff establishes a *prima facie* case, and if the defendant then proffers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the

plaintiff to show that the defendant's proffered reason was a pretext for discrimination. *Heyman v. Queens Vill. Comm. For Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999). The plaintiff will ultimately prevail on his ADA discrimination claim only if he proves that his disability was "the but-for cause" of the adverse employment action. *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019). Under the CFEPA, the Plaintiff need only show that his disability was a motivating factor in the adverse action, rather than the but-for cause. *See Wallace*, 213 Conn. App. at 618.

The parties do not dispute that Defendant is subject to the relevant statutes and that Plaintiff's stress- and heart-related conditions qualified him as suffering from a disability within the meaning of the statutes. They dispute whether Plaintiff suffered an adverse employment action, whether he was able to perform the essential functions of his job with or without reasonable accommodation, and whether any adverse employment action suffered was the result of his disability.

### 1. *Prima Facie Case*

#### a. Adverse Employment Action

As an initial matter, the Court rejects Defendant's argument that Plaintiff did not suffer an adverse employment action. Defendant argues that, because his termination was classified as a voluntary abandonment or resignation under the terms of the Collective Bargaining Agreement, *see generally* Ex. W, ECF No. 81-1 at 280, this cannot be considered an adverse employment action. *See* ECF No. 80 at 28. Plaintiff does not address this argument; however, the two cases Defendant cites in support of this proposition do not conclusively decide the issue. The first deals with an employee who submitted a letter of resignation. *See Shaw v. Yale New Haven Hosp.*, No. 3:18-CV-00067 (VLB), 2020 WL 1923599, at *8 (D. Conn. Apr. 21, 2020). The second involves

an employer that determined an employee had abandoned her job one year after she failed to return from medical leave, which the court found could not constitute "discharge" and was therefore not an adverse employment action.  *See Brunson v. Bayer Corp.*, 237 F. Supp. 2d 192, 206 (D. Conn. 2002).  The situation here is very different, as Plaintiff was terminated only shortly after being notified that his absence would be *deemed* a voluntary quit—he did not submit a resignation letter or abandon his post for nearly as long as the plaintiff in *Brunson*.  Although this voluntary quit may have been in accordance with the collective bargaining agreement (Plaintiff does not argue that it was not), the Court is not prepared to conclude that Plaintiff voluntarily resigned or abandoned his post as a matter of law and finds that, for purposes of a *prima facie* case, Plaintiff's termination was an adverse employment action.

### b.  Ability to Perform Essential Functions

Defendant also argues that Plaintiff could not perform the essential functions of his job, essentially due to his extended absence from the job.  Plaintiff does not appear to dispute this argument.  *See* ECF No. 84 at 23–28 (generally arguing that the BOE's reason for terminating him was pretextual and retaliatory).  Given that Plaintiff's disability required him to take leave from work, it seems clear that he could not perform the essential functions of his job without receiving a reasonable accommodation.  *See Wenc v. New London Bd. of Educ.*, 702 F. App'x 27, 30 (2d Cir. 2017) (summary order) (teacher on "physician-ordered medical leave" could not perform essential functions of his job).

The question then becomes whether he could perform the essential functions of his job *with* a reasonable accommodation.  A plaintiff who seeks to recover under the theory that his employer failed to offer him a reasonable accommodation before engaging in an adverse employment action must demonstrate, at the *prima facie* stage, "that (1) he has a disability within the meaning of the

ADA; (2) his employer is covered by the statute and had notice of that disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) his employer has refused to make such accommodations." *See id.* at 29. If the Plaintiff carries that burden, the employer must demonstrate that providing the accommodation would result in undue hardship. *See Nandori v. City of Bridgeport*, No. 3:12CV673 JBA, 2014 WL 186430, at *5 (D. Conn. Jan. 16, 2014) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000)).

In general, an employee is responsible for requesting the necessary accommodation. *See McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012). At the very least, a plaintiff always "bears the burdens of both production and persuasion as to the *existence* of some accommodation that would allow her to perform the essential functions of her employment." *McBride*, 583 F.3d at 97 (emphasis added). This requested accommodation must enable the employee to perform his or her essential functions "at or around the time at which it is sought." *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir.2009) (summary order).

Plaintiff undisputedly requested one accommodation—leave "until further notice." Pl.'s L.R. 56(a)2 St. ¶ 65. However, this request was not reasonable. *See Nandori*, 2014 WL 186430, at *6–7 (collecting cases and holding request for indefinite leave was not reasonable); *see also Parker*, 204 F.3d at 338 ("The duty to make reasonable accommodations does not . . . require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work."); *Green v. Cellco P'ship*, 218 F. Supp. 3d 157, 164–65 (D. Conn. 2016) (noting that the Second Circuit "has indicated that the request [for leave] may only be for a finite leave rather than an indefinite leave"). As discussed above,

Plaintiff's request for leave until further notice would not allow Plaintiff to perform the essential functions of his job.

There is some dispute as to whether Plaintiff requested any other accommodation before he was terminated; namely, to use his vacation time to cover his leave. *Compare* Flegler Aff. ¶¶ 63, 66 (Plaintiff never requested to use vacation time or to work remotely and did not have available sick time) *to* Wynn Dep. Tr. at 134:20–135:18 (stating he requested to use vacation time before he was terminated, and that he requested to work remotely after he was terminated). There is no evidence in the summary judgment record to suggest how much vacation time Plaintiff had available at the time, although the Second Amended Complaint states that he had 35.5 vacation days and 3 personal days. ECF No. 41 ¶ 50; *see also* Fed. R. Civ. P. 56, Adv. Comm. Notes (recognizing that the "very mission of the summary judgment procedure is to pierce the pleadings" and disavowing doctrine which "permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment"). But, even assuming Plaintiff made a request for vacation time, and even assuming he had produced actual evidence that demonstrated he had this available vacation time, Plaintiff still would have failed to demonstrate that this was a reasonable accommodation request because he has not demonstrated that using this vacation time would have been sufficient to allow him to return to work and perform the essential functions of his job.

The situation is similar to that in *Graves v. Finch Pruyn & Co.*, in which the Second Circuit found that a plaintiff's request for "two weeks unpaid leave" to consult with a doctor was not a reasonable accommodation because plaintiff "made no showing that the accommodation would likely result in his return to work," in light of prior communications from his doctor which suggested he would require much more leave time. 353 F. App'x 558, 559–60 (2d Cir. 2009) (summary order). Here, Plaintiff testified that he had no sense of when he would be able to return

to work at the BOE when he submitted the June request for leave.  Wynn Dep. Tr. 127:23–128:1; *see also id.* at 149:23–150:9 (testifying that he wanted enough time to "get [his] health back in order," and recognizing that he never provided a specific timeline to Defendant).  Thus, as in *Graves*, Defendant was never provided assurance that allowing Plaintiff to use his vacation time "would likely result in his return to work."  *Graves*, 353 F. App'x at 559–60; *see also Nandori*, 2014 WL 186430, at \*7 (finding plaintiff failed to establish a *prima facie* case of disability discrimination where "[a]s Plaintiff admitted in his deposition, at the time of his retirement, Plaintiff had no sense of when he would be sufficiently recovered to perform the essential functions of his job . . . . Plaintiff never communicated to Defendant, either in his June 15, 2010 letter or otherwise, what his estimated return date might be, nor, as he admits, could he have.").[13]

At times, an employer may be required to "act proactively and engage in an interactive process" in order to identify a suitable accommodation, without the employee requesting one.  *See McElwee*, 700 F.3d at 642; *see also Thomson v. Dep't of Soc. Servs.*, 176 Conn. App. 122, 129 (2017) (holding that the duty to engage in an "informal, interactive process" arises "once a disabled individual has suggested to his or her employer a reasonable accommodation") (citation omitted and cleaned up).  "Nevertheless, an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal," *McElwee*, 700 F.3d at 642, nor can an employee "who is responsible for the breakdown of that interactive process . . . recover for a failure to accommodate," *Zito v. Donahoe*, 915 F. Supp. 2d 440, 446 (S.D.N.Y. 2012).

---

[13] The Court notes that on July 23, 2021, the day by which he had been informed he needed to return to work, Plaintiff sent a doctor's note stating that Plaintiff was "advised to stay out of work" due to "his medical conditions, and follow up appointments" until September 23, 2021.  Ex. U, ECF No. 81-1 at 270–71.  Neither party addresses this request in its briefing; thus, any argument that this request constituted a request for a reasonable accommodation has been abandoned.  Nonetheless, the Court notes that this request, too, would suffer from the same defect as any purported request to use vacation or sick time, as it does not provide any assurance to Defendant that, at the conclusion of this period, Plaintiff would be able to return to work.

Plaintiff here argues that Defendant failed to engage in this interactive process. However, as discussed above, Plaintiff has not established that he requested a reasonable accommodation or that one existed; thus, Defendant's duty to engage in the interactive process was never triggered. *See Wenc*, 702 Fed. App'x at 30; *Nandori*, 2014 WL 186430, at *8. And, though Defendant admittedly could have made more effort to engage with Plaintiff, Defendant did repeatedly communicate to Plaintiff that his leave request had been denied and he was expected back at work, including via his personal email address. *See* Ex. T, ECF No. 81-1 at 263–64; *see also Georgia v. City of Bridgeport*, No. 3:19-CV-00234 (VLB), 2020 WL 4586695, at *9 (D. Conn. Aug. 10, 2020) (noting that one factor courts consider a step towards engaging in the interactive process is "showing some sign of having considered the employee's request") (cleaned up and citation omitted). To the extent Plaintiff never responded to these notices or acknowledged them in any way, he is "responsible for the breakdown in the interactive process." *See Georgia*, 2020 WL 4586695, at *16.

In sum, Plaintiff's disability discrimination claims fail because he cannot carry his *prima facie* burden of demonstrating that he could perform the essential functions of his job, with or without a reasonable accommodation. Though this is sufficient to reject Plaintiff's claim, the Court for completeness proceeds to analyzing whether Plaintiff can meet the last element of his prima facie burden, an inference of discrimination, as well as the last two steps of the *McDonnell Douglas* burden-shifting framework.

### c.   Inference of Discrimination

Plaintiff's claim also fails here, as Plaintiff cites to no evidence that Defendant's decision to terminate him was motivated by his disability. The fact that members of HR informed him his request for leave had not been approved and his leave was unauthorized, *see* Ex. T, ECF No. 81-1

at 263–64, in no way suggests discrimination. *See Hatch v. Brennan*, 792 F. App'x 875, 878 (2d Cir. 2019) (summary order) (noting that "letter inform[ing]" plaintiff of deficient medical paperwork was not evidence that "the steps taken by [employer] to address the fact that an employee was absent without properly documented leave—an ordinary job responsibility for a supervisor—pertained to any perceived disability, let alone that it was discriminatory"). In addition, Plaintiff fails to identify any similarly situated individuals who requested and received an indefinite leave of absence, disabled or otherwise. Plaintiff named two individuals in his deposition (in addition to stating that a "plethora" of other such individuals existed) whom he believed had taken extended leave for an unspecified reason and not been terminated. *See* Wynn Dep. Tr. at 138:6–139:8. Defendant provides further information about these individuals, including that both of them took leave due to medical disabilities. One of these individuals "provided medical documentation requesting an extension to a specific date," and the other never exhausted her leave entitlements. Flegler Aff. ¶¶ 68, 69. Plaintiff does not dispute this evidence and, because neither of these individuals were non-disabled, or requested and received an indefinite leave extension, the evidence submitted "does not permit comparison of their conduct" with Plaintiff's; therefore, "no inference of discrimination can be drawn from the different results of that conduct." *See Zito*, 915 F. Supp. 2d at 449 (plaintiff did not provide any information about whether purported comparator individuals had been granted accommodation without providing updated medical documentation, unlike plaintiff). Plaintiff is left only with "[s]peculative claims that [he] fared worse than employees outside the protected class," which "will not support an inference of discrimination." *See Lizee v. Yale Univ.*, No. CV136038928S, 2014 WL 4099324, at *7 (Conn. Super. Ct. July 15, 2014). In addition, it is undisputed that Defendant has terminated other employees for failure to return from leave. Pl.'s L.R. 56(a)2 St. ¶ 85. Thus, Plaintiff has

provided no evidence from which the Court could draw an inference of discrimination, and his claim fails for this separate and independent reason as well.

### 2. *Legitimate, Non-Discriminatory Reason*

Assuming Plaintiff had met his *prima facie* burden, the burden would shift back to Defendant to offer a legitimate, non-discriminatory reason for Plaintiff's termination.  Defendant offers such reasons:  the failure to return from extended medical leave, the failure to indicate that there was any point at which he would return, and the failure to submit appropriate paperwork to support a request for further leave.  It also notes that, as Plaintiff was working a second job, the BOE had reason to believe that his claim that he could not return to work was false.

### 3. *Pretext*

Ultimately, even if Plaintiff could make out a *prima facie* case, he could not satisfy his burden at the third stage, as there is no evidence that Plaintiff's disability motivated Defendant's decision to terminate him, and that Defendant's proffered reason for terminating him was pretextual.  In fact, Plaintiff's brief primarily argues that Plaintiff's termination was a pretext for *retaliation* from Plaintiff's letter and complaints regarding race discrimination, *see* ECF No. 84 at 26–28—the Court has already rejected this argument, but even were the Court to accept it, it does nothing to demonstrate that Defendant was motivated by Plaintiff's *disability* in terminating him. Plaintiff also spends time making arguments regarding the falsity of Defendant's explanation that it discovered Plaintiff's second job.  As discussed above, Defendant does not aver that it discovered Plaintiff had a second job, only that it suspected he was working a second job during his leave, which may have played into the decision to terminate him.   Plaintiff, who articulated in his deposition (after his termination) that his stress disability pertained only to his job at the BOE (and not to his second job), *see, e.g.*, Wynn Dep. Tr. at 144:8–23, fails to grapple with the fact that

Defendant was not made aware of this distinction at the time, *see, e.g.*, Ex. M, ECF No. 81-1 at 240 ("out of work"), Ex. Q, ECF No. 81-1 at 256 ("out of work until further notice"); thus, Defendant's suspicion that Plaintiff may have been working a second job has not reasonably been called into question as possible pretext for disability discrimination. On the whole, beyond the fact that Plaintiff had a disability at the time he was terminated, Plaintiff has provided not one scintilla of evidence to suggest that his disability was a motivating factor, let alone a but-for cause, of his termination. Accordingly, his disability discrimination claims fail.

## IV.    CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED in full. The Clerk is directed to enter judgment in favor of Defendant and close this case.

**SO ORDERED** at Hartford, Connecticut, this 18th day of March, 2024.

  */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE